[No. 40380.   Department Two.     July 10, 1969.]

THE STATE OF WASHINGTON, *Respondent,* v. EUGENE F. CUZZETTO, *Appellant.*\*

*Dellwo, Rudolf & Grant* and *Richard J. Schroeder,* for appellant.

*George A. Kain, Matt L. Alexander,* and *Donald C. Brockett,* for respondent.

HILL, J.—Eugene Cuzzetto was found guilty of negligent homicide, driving while under the influence of intoxicating liquor, and reckless driving. We have for consideration his appeal from these convictions.

The established facts are: Appellant and Mrs. Laura Adams were riding in appellant's car (a 1966 Ford Galaxie hardtop, 2-door) in the very early morning of Sunday, August 27, 1967; he was intoxicated; that while traveling at a speed variously estimated from 60 to 80 miles an hour (45 miles per hour being the legal limit at the time and place) the car in which they were riding went off the road and down into a freshly plowed field, skidded sideways, turned

*Reported in 457 P.2d 204.

over several times, and finally stopped upright on its wheels with the right door jammed shut so that it could not be opened. Some time during its gyrations, Mrs. Adams and appellant were both thrown from the car—she, apparently, through the rear window. Her face and head were horribly cut, and death was assumed to be instantaneous. Appellant sustained two broken and some cracked ribs, a leg injury (which did not prevent his walking), two big lumps on his head, and, naturally, a severe shock.

To secure a conviction on any one or all of the three charges, the state had the burden of proving beyond a reasonable doubt that appellant was driving the car.

Appellant testified that after he and Mrs. Adams left the Rainbow Tavern at Hauser Lake, Idaho, just before midnight (Saturday, August 26), following an evening of drinking and dancing, the next thing he could remember was "a crowd of people and, oh, of, ah, unsettled feeling inside of me, uncomfortable feeling." He didn't know where this was. His first definite remembrance was "sitting in the tub in the hospital giving myself a bath." This was Sunday morning, August 27. He testified further that he did not know whether he or Mrs. Adams had been driving the car.

Despite his subsequent complete lack of recollection, he had answered questions and talked with a number of people in the period of more than 2 hours he was at the scene following the tragedy. The evidence to prove that appellant had been driving the car comes from the statements made by him during that period.

Eight teenagers in a car returning from a drive-in theater and traveling in the opposite direction to appellant's car, saw that car just before it left the road and immediately after. Some saw appellant's car with its right wheels off the traveled roadway going "sixty to seventy" or "seventy to eighty miles an hour." After appellant's car went off the road into the plowed field, the teenagers backed their car two or three hundred feet to the point where appellant's car had left the road. Some of them then went down into the plowed field to render any assistance they

could. They found no one in the car, but soon discovered Laura Adams' body; two of the boys found appellant on the ground trying to get up. They went to his assistance. On inquiry as to how he felt, he replied "fine." They helped him up to the road and one of the boys asked him if he had been driving and he said, "I guess so." The boy then asked if he had fallen asleep at the wheel, and he replied, "I guess so."

Two other boys and two of the girls heard one or the other of these inquiries and appellant's responses of "I guess so." The boy who made the inquiries also testified that the appellant kept asking them "not to call the cops."

It is conceded that this testimony was admissible. The boys to whom appellant talked were not officers, and he was under no restraint.

We come now to a consideration of a statement by appellant which was excluded from the jury's consideration.

At about 12:58 a.m., the first state patrol trooper, James R. Johnson, arrived. The appellant was on the road with the teenagers by this time, and he was the only one who knew what had happened. The trooper asked him if the woman had been driving, and he responded "I was."

The trial court held that this constituted an interrogation by an officer before appellant had been warned of his constitutional rights, and it was excluded from the consideration of the jury.[1]

Officer Johnson then advised appellant of his constitutional rights (giving what are now generally referred to as "Miranda warnings"[2]). Appellant indicated that he under-

---

[1] Some members of this court question whether an officer during the investigative stage of any inquiry, and while he is trying to find out what has happened, is so restricted. We do not pass on that question because the answer was excluded.

[2] See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). The "Miranda warnings" as given were:

I am Trooper Johnson of the State Patrol. You have the right to remain silent. Anything you say can and will be used against you in a Court of law. You have the right to the presence of an attorney, and if you cannot afford an attorney one will be appointed for you prior to any questioning, if you so desire. Do you understand these rights? Do you wish to waive them and answer my question?

stood the warnings and did not desire to waive them. Trooper Johnson did not question him further.

State Patrol Trooper James Hingston arrived a few minutes later (at about 1 a.m.) and, being the senior trooper, took charge. He was advised by Trooper Johnson that appellant had been advised as to his constitutional rights. Another trooper, Louis E. Walker, also arrived and was with Hingston when the latter first talked with the appellant. Hingston testified that he had asked appellant if he owned the Ford in the field and if he had been driving it, to both of which questions appellant responded, "yes." After a short conversation with appellant, Trooper Hingston placed him under arrest on a charge of public intoxication, and placed him in the back seat of Trooper Johnson's patrol car. Appellant was left alone in that car while the investigation continued. When Johnson returned to his car, appellant volunteered the statement, "I did all I could to avoid the accident."

A deputy from the prosecuting attorney's office, Clarence A. Boling, arrived at about 2 a.m. He also advised appellant of his constitutional rights, and the latter indicated that he wanted to waive his rights and told Mr. Boling about the trip to Hauser Lake, and said that he had been driving at the time of the accident.

The trial court had held a CrR 101.20W hearing before the trial began, and while the statement made to Trooper Johnson before the appellant was advised of his constitutional rights was excluded, the trial court determined that despite appellant's intoxication, he did voluntarily and intelligently waive his constitutional privilege to remain silent when talking to Hingston and Boling, and in his volunteered statement to Johnson that he had done all he could to avoid the accident.

The jury was also instructed[3] that any admissions made

---

[3]"Evidence has been introduced that the defendant made certain admissions relating to the crime charged. You should weigh such evidence with caution and should carefully scrutinize all of the circumstances surrounding the admissions to determine whether they were made freely and voluntarily. If you find that the admissions were made

by the appellant must be disregarded unless they were made freely and voluntarily.

It is the contention of the appellant that the trial court erred in admitting the statement he volunteered to Trooper Johnson and his responses to the questions of Trooper Hingston and to those of Deputy Prosecutor Boling after the warnings had been given.

Appellant points out that he was arrested for intoxication in public and claims that the combination of intoxication and shock made it impossible for him to knowingly and voluntarily waive his constitutional right against interrogation.

He directs particular attention to Boling's statement that at times during his interrogation he (the appellant) was incoherent and tended to wander from the subject and that, on occasion, questions had to be repeated. It must be remembered, however, that Boling and the appellant were talking for more than 30 minutes and that during that time the appellant gave Boling a very detailed account of the evening's activities; definitely placed himself at the wheel of the car, and complained that there had been lights on his

---

freely and voluntarily by the defendant—with an understanding of the nature of such admissions; without fear or coercion, either physical or physchological [sic]; and without promise of reward—you may consider them together with all of the other evidence in determining the innocence or guilt of the defendant. However, if you find that the admissions were not made freely and voluntarily by the defendant, you must disregard them entirely.

"In considering whether the alleged admissions were free and voluntary or not, you may consider the conversations between the officers and the defendant, the time and place that the alleged admission occurred, the length of time the defendant was questioned, the other persons present, the physical and mental condition of the defendant, and all other circumstances surrounding the making of the alleged admissions, including the sex, age, disposition, education, experience, character, intelligence, and previous training of the defendant.

"Admissions are not involuntary solely because illicited by questions, or made while the defendant was under arrest, or made in the absence of counsel, or made without warning or caution that he had the right to remain silent and that his statements might be used against him. However, you may consider such circumstances in determining whether the alleged admissions were freely and voluntarily made or not." (Instruction No. 14.)

side of the road. Boling quotes him as having said, "Well, they may not have been on my side of the road, but it looked like it to me."

The doctor who examined appellant at the hospital on Sunday morning, August 27, testified that appellant told him that he did not know who had been driving the car. The doctor testified further that it was possible for a person to have a loss of memory under the circumstances.

It is quite clear that incriminating statements were made after the Miranda warnings had been given to the appellant, and the primary question presented here is whether he was so intoxicated that he could not knowingly and voluntarily have waived his right to remain silent.

A very comprehensive review of the cases on the subject of the effect of intoxication on the voluntariness of confessions is found in 69 A.L.R.2d 361, wherein, at page 364, the annotation says:

> The courts are agreed that proof that one who has confessed to crime was intoxicated at the time of making a confession goes to the weight and credibility to be accorded to the confession, but does not require (at least where the intoxication does not amount to mania, and the intoxicants were not furnished the accused by the police or other government officials) that the confession be excluded from evidence.

(Footnotes omitted.)

That annotation appeared in 1960 and since that time more than a score of cases have considered the effect of intoxication on the voluntariness of confessions or inculpatory statements. Most of the cases refer to and approve the rule as stated in the annotation, and in only three cases has it been held error to have admitted the confessions or inculpatory statements. In a fourth case the trial court refused to admit the confessions made while intoxicated and directed an acquittal. On an appeal by the state, the trial court's action was affirmed. We elaborate somewhat on these four cases.

The case on which the appellant places his greatest reliance is *Logner v. North Carolina*, 260 F. Supp. 970

(M.D.N.C. 1966). This was a habeas corpus proceeding in a United States District Court by a state prisoner. It was held that the prisoner (Logner, who had been convicted of safe cracking and safe robbery on the basis of incriminating statements made during the interrogation following his arrest for driving while under the influence of intoxicants) was too intoxicated to realize what he was doing. The conviction had been affirmed by the North Carolina Supreme Court, *State v. Logner,* 266 N.C. 238, 145 S.E.2d 867 (1966), and certiorari had been denied by the United States Supreme Court, *Logner v. North Carolina,* 384 U.S. 1013, 16 L. Ed. 2d 1032, 86 S. Ct. 1983 (1966). The facts in that case were: At about 11:30 a.m. two officers had seen Logner in downtown Durham. They did not regard him as drunk enough to be arrested, but when he drove away in his car they followed—being fearful of an accident. He had gone only two or three blocks when an accident did occur. The driver of one of the cars testified that Logner was obviously drunk and was even unable to put his car in reverse to back away from the cars with which he had collided. He had to be helped from his car. The patrolman who investigated the accident noted in his report that Logner was "drunk and was unable to give a statement as to what happen [*sic*]."

The court's summation was as follows:

The facts leave little doubt as to the petitioner's state of intoxication. He was arrested for driving under the influence. The investigating officer noted he was too drunk to make a statement. At the initial interrogation the officers admitted the petitioner was intoxicated. [This was at noon.]

At the second interrogation, one police officer stated the petitioner was already gone. Later that afternoon both officers had little patience with the petitioner because he was drunk. [This interrogation was at 2:30 p.m.]

At the third interrogation of the day, which lasted from before 7:30 P.M. to midnight, the fact that the petitioner was still under the influence was apparent to all present.

In each of the three interrogation sessions, the petitioner was admittedly in some state of intoxication, and while he was in this state he was interrogated for the purpose of eliciting a confession. This state of intoxication prevented the petitioner from making a confession which could be considered voluntary.

*Logner v. North Carolina, supra* at 975.

Logner was so drunk when arrested that he could not make a statement about the traffic collision. Apparently he was still very drunk and confused during the afternoon. At least as to the first and second interrogations, we could agree with the U. S. District Court that Logner was so intoxicated that he could not knowingly have waived his constitutional rights.

Our research has yielded three other cases favoring appellant's position. In the first of these, *Vandegriff v. State*, 409 S.W.2d 370 (Tenn. 1966), the appellant, who was found guilty of voluntary manslaughter, had been interrogated at the emergency room of a hospital. He was in a dazed condition; had a hairline fracture of his skull, a nose fracture, a fracture of facial bones, a fracture of the flora of the eye socket, had sustained a brain concussion, and "may have been under the influence of alcohol." Prior to his interrogation he was not advised of his constitutional rights to remain silent, or to have counsel, or that any statement might be used against him. The Tennessee Supreme Court said:

It cannot be doubted, on this record, that at the time of these inculpatory statements, the defendant had, in substantial part at least, been shorn of his volition. His statement could not have been "the product of a free intellect".

We also note *Warren v. State*, 44 Ala. App. 221, 205 So.2d 916, 919 (1967). In that case the Alabama Court of Appeals said:

The proof clearly shows that defendant's intoxication amounted to mania, that is, he was so drunk as to be unconscious of the meaning of his words, and that such intoxication rendered inadmissible his confession.

The Supreme Court of Alabama denied certiorari, 281 Ala. 725, 205 So.2d 920 (1968).

The fourth case to which we have referred is *State v. Williams,* 208 So.2d 172 (Miss. 1968). This case must be *sui generis.* The defendant Williams, while in jail for public drunkenness in 1966, insisted on confessing that he had killed and robbed a man in 1947, some 19 years earlier. The court refused to admit the confession because it was made while the defendant was completely under the influence of intoxicating liquor and could not effectively waive his constitutional rights. From a directed verdict of acquittal, the state appealed. The Mississippi Supreme Court in its opinion affirming the trial court points out:

> Custodial interrogation in the true meaning of the term did not take place, since it was only at the imploration and insistence of appellee that Judge Dale listened to his confession and simultaneously asked appellee pertinent questions relating to the details thereof. His intoxication, with other factors, had produced mania, making it impossible for his intellect to comprehend what he was saying and doing.

We quote again from the opinion (p. 175):

> A thorough and careful review of the record and the briefs of counsel convinces us the proof is sufficient to establish the fact that the trial judge did not abuse his discretion in excluding the oral confession made by the appellee to Judge Dale. See Annot., 69 A.L.R.2d 361-70 (1960). The record clearly shows that the appellee was in an acute, rampant state of intoxication equivalent to mania. In his deranged and psychotic mental imbalance the appellee could not have rationally, voluntarily and intentionally waived his constitutional rights guaranteed by the 5th Amendment to the United States Constitution, and by Article 3, Section 26 of the Mississippi Constitution.

The present case bears no appreciable resemblance to any of the four cases we have just discussed. They all fit into the exception to the general rule (see rule and exception as stated on page 541).

The appellant's condition at the time he made the statements relied on by the state was not comparable to that of

the helplessly drunken Logner; the near hysterical, babbling, maudlin Williams; the border line mental defective Warren whose intoxication amounted to mania; or the severely injured and dazed Vandegriff, suffering from a concussion and awaiting emergency attention at a hospital.

There can be no question but that the appellant understood what was being said to him; and that he understood the Miranda warnings. The trial court after excluding the statements made to the officer prior to the giving of the Miranda warnings, admitted the statements made thereafter. It further charged the jury that they were to consider only the alleged admissions that they found to be freely and voluntarily made, thus giving the appellant every safeguard to which he was entitled. (For the instruction given, see note 3.)

We find no prejudicial error in the record and affirm the judgment of conviction.

HUNTER, C. J., ROSELLINI, and NEILL, JJ., and DONWORTH, J. Pro Tem., concur.