# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,          )
                              )    No. 69862-1-I
          Respondent,         )
                              )    DIVISION ONE
     v.                       )
                              )    UNPUBLISHED OPINION
VONDA VALISA PRITCHARD,        )
                              )
          Appellant.          )    FILED: April 29, 2013
                              )
_____ )

APPELWICK, J. — This appeal arises from Pritchard's conviction for vehicular assault. She challenges the sufficiency of her charging document and the admissibility of evidence relating to her intoxication while driving. We affirm.

## FACTS

Around 7:30 p.m. on July 5, 2010, Vonda Pritchard was driving her dark green Land Rover sport utility vehicle eastbound on Highway 101 just outside of Port Angeles, Washington. She attempted to make a left turn at a high speed, knocked over a yield sign, hit a ditch, became airborne, and then collided with another car heading the opposite direction. One witness observed Pritchard weaving in her lane before the crash, and began calling 911 before Pritchard even collided with the other car, "because it didn't look good." The same witness testified that Pritchard was moving "way too fast" to make the turn. Shirley Holman, the passenger in the other car, suffered a fractured rib and a dislocated wrist.

Washington State Patrol Trooper John Ryan responded to the scene of the accident moments later. He found Pritchard slumped from the driver's seat over on to the passenger side of her car. He thought she appeared "highly intoxicated," because her eyes were bloodshot and watery, he smelled alcohol on her, and he noticed an

open container of alcohol in her driver side door. But, at that point, Trooper Ryan did not arrest Pritchard.

From the scene, Pritchard was transported by ambulance to Olympic Memorial Hospital. She was brought into the emergency room strapped to a full c-spine backboard with her head immobilized. While she was still strapped to the backboard, Trooper Ryan entered Pritchard's hospital room and told her that he was investigating the collision. Pritchard asked him what happened. After explaining the accident, Trooper Ryan asked Pritchard where she had been. She responded that she was driving from Traylor's, a restaurant and bar on the outskirts of Port Angeles. He then asked her if she had been drinking. Pritchard admitted that she had three drinks at Traylor's and one earlier in the day. When she declined to perform voluntary sobriety tests, Trooper Ryan placed her under arrest for driving under the influence (DUI) and read her Miranda[1] rights to her.

After arresting Pritchard, Trooper Ryan went back to his office to begin writing a report and filling out a DUI ticket. A few hours later he returned to the hospital and read Pritchard a special evidence warning that her blood would be tested without her consent to determine the concentration of alcohol or drugs. Around 11:30 p.m., a phlebotomist drew two vials of blood from Pritchard. The vials were then sent to the Washington State Toxicology Laboratory (WSTL) for testing. Test results showed that Pritchard's blood alcohol content was .14 four hours after the collision.

The State charged Pritchard by criminal information with all three alternatives to vehicular assault under RCW 46.61.522(1). The trial court instructed the jury that it

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

could convict Pritchard under the three alternative means: (1) driving under the influence of alcohol, (2) driving in a reckless manner, or (3) driving with disregard for the safety of others. The jury returned unanimous special verdicts finding Pritchard guilty of both driving under the influence and driving with disregard for the safety of others. Pritchard timely appealed.

## DISCUSSION

Pritchard makes four arguments on appeal. First, she challenges the sufficiency of her charging document. Second, she argues that her statements to Trooper Ryan should have been suppressed, because they were involuntary and she was in custody. Third, she contends that her blood test results should have been excluded because the State failed to show that they contained the required chemicals to preserve the blood sample. Fourth, she argues that testimony from her emergency room nurse violated her nurse-patient privilege and the Health Information Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. §§ 1320d to 1320d-8.

Vehicular assault is an alternative means crime. RCW 46.61.522(1); State v. Roggenkamp, 153 Wn.2d 614, 626, 106 P.3d 196 (2005). The jury returned unanimous special verdicts finding Pritchard guilty of both driving with disregard for the safety of others and driving under the influence. The Washington Supreme Court defines disregard for the safety of others as "an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term 'negligence.'"[2] State v. Eike, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967). Proof of

---

[2] The jury instruction at Pritchard's trial tracked this language closely.

3

intoxication is not required to convict for driving with disregard for the safety of others.[3] See, e.g., id. at 766 (defendant rounded a sweeping curve at 45 to 50 miles per hour on the wrong side of the road and struck on oncoming car head-on). The sufficiency of the charging document challenge attacks both special verdicts. Pritchard does not challenge the sufficiency of evidence supporting the unanimous verdict of driving with disregard for the safety of others. Pritchard's remaining three arguments go to her intoxication while driving. They attack both the conviction on the DUI special verdict and the sentence, which was based on her level on intoxication while driving.

## I. Sufficiency of Charging Document

For the first time on appeal, Pritchard argues that the information charging her with vehicular assault omitted an essential nonstatutory element of the offense. She asserts that this violates her constitutional right to adequate notice under the Sixth and Fourteenth Amendments, as well as article I, section 22 of the Washington Constitution.

We review challenges to the sufficiency of a charging document de novo. State v. Williams, 162 Wn.2d 177, 182, 170 P.3d 30 (2007). To be constitutionally adequate, a charging document must include all essential elements of the crime, both statutory and nonstatutory. State v. Kjorsvik, 117 Wn.2d 93, 101-02, 812 P.2d 86 (1991). The primary purpose of this rule is to give defendants sufficient notice of the charges so they can prepare an adequate defense. Id. at 101.

---

[3] The jury instructions explicitly delineated between the three alternative means to convict. And, the prosecution did not argue that intoxication was evidence of driving with disregard for the safety of others.

The vehicular assault statute provides, in part:

A person is guilty of vehicular assault if he or she operates or drives any vehicle:

      (a) In a reckless manner and causes substantial bodily harm to another; or

      (b) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502, and causes substantial bodily harm to another; or

      (c) With disregard for the safety of others and causes substantial bodily harm to another.

RCW 46.61.522(1). Pritchard argues that an additional nonstatutory element is proof of proximate cause between the accident and the defendant's intoxication, recklessness, or disregard for the safety of others.[4]

The case Pritchard cites for this contention addresses the former version of the vehicular homicide statute. State v. Sanchez, 62 Wn. App. 329, 331 & n.3, 814 P.2d 675 (1991) (citing former RCW 46.61.520(1) (1983)). The Sanchez court relied on State v. MacMaster, 113 Wn.2d 226, 778 P.2d 1037 (1989), which engrafted on the former vehicular homicide statute a proximate cause requirement between the defendant's intoxication and the victim's death to avoid a strict liability result. Sanchez, 62 Wn. App. at 331. However, a 1991 amendment to the vehicular homicide statute overturned the MacMaster proximate cause requirement. State v. Rivas, 126 Wn.2d 443, 451, 896 P.2d 57 (1995). The court confirmed that the legislature has authority to

---

[4] At Pritchard's trial, jury instruction 10 read: "To constitute VEHICULAR ASSAULT, there must be a causal connection between the substantial bodily harm to a person and the driving of a defendant so that the act done was a proximate cause of the resulting substantial bodily harm." Jury instructions not objected to become the law of the case. State v. Salas, 127 Wn.2d 173, 182, 897 P.2d 1246 (1995). But, the law of the case doctrine only applies to jury instructions, not charging documents. See State v. Tvedt, 153 Wn.2d 705, 718, 107 P.3d 728 (2005). Charging documents need only state the essential statutory and nonstatutory elements of the crimes charged. Id.

create strict liability crimes. Id. at 452. The vehicular homicide statute now requires the State to prove only a causal connection between the act of driving and the accident. Id. at 451-52. Consequently, Sanchez is no longer the law and does not support Pritchard's argument.

The vehicular assault statute requires only that the defendant cause substantial bodily injury to another while driving under the influence, recklessly, or with disregard for the safety of others. RCW 46.61.522(1); see also State v. Pappas, 176 Wn.2d 188, 194, 289 P.3d 634 (2012) (noting that the legislature amended the vehicular assault statute in 2001 to eliminate the proximate cause requirement). The information was not defective for failing to include a nonstatutory proximate cause element. We therefore affirm Pritchard's conviction on the alternative means of driving with disregard for the safety of others.

II.   Admission of Statements Made at the Hospital

Pritchard asserts two reasons why her statements to Trooper Ryan at the hospital should have been suppressed, which we address in turn below.

A. Seizure and Custodial Interrogation

Pritchard argues that the trial court erred in admitting her statements to Trooper Ryan at the hospital, because they were the product of custodial interrogation without the benefit of Miranda. Essentially, Pritchard contends that she was in custody when Trooper Ryan questioned her, because she was immobilized on a backboard and physically unable to leave. She argues that a reasonable person in that situation would not have felt free to terminate the encounter

Pritchard couches her argument in terms of <u>Miranda</u> and the Fifth Amendment. The State responds, citing both Fourth and Fifth Amendment cases. For the purposes of our analysis, what constitutes a "seizure" under the Fourth Amendment and what constitutes "custody" under the Fifth Amendment are analogous inquiries. Whether police conduct amounts to a seizure is a mixed question of law and fact. <u>State v. Harrington</u>, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). We give the trial court great deference in resolving the facts. <u>State v. Thorn</u>, 129 Wn.2d 347, 351, 917 P.2d 108 (1996), <u>overruled on other grounds by</u> <u>State v. O'Neill</u>, 148 Wn.2d 564, 62 P.3d 489 (2003). But, the ultimate determination of whether those facts constitute a seizure is one of law that we review de novo. <u>Id.</u> We review whether a defendant is in custody for <u>Miranda</u> purposes de novo. <u>State v. Lorenz</u>, 152 Wn.2d 22, 36, 93 P.3d 133 (2004).

A person is "seized" if, viewing all the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave. <u>United States v. Mendenhall</u>, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). Examples of such circumstances include the threatening presence of several police officers, display of a weapon, some physical touching of the person, or use of language or tone of voice indicating that compliance with the officer's request might be compelled. <u>Id.</u>

The "free to leave" test is not automatically satisfied when a person is not physically free to leave. See <u>Florida v. Bostick</u>, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). Rather, the crucial test is whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter. <u>Id.</u> For instance, in <u>Bostick</u>, the defendant was waiting on a bus when police boarded for random drug interdiction. <u>Id.</u> at 431. They asked to inspect Bostick's ticket and

identification, and they requested to search his luggage. Id. at 431-32. The Court explained that the mere fact that Bostick did not feel free to leave the bus did not mean that the police seized him. Id. at 436. His freedom of movement was restricted by a factor independent of police conduct, because the bus was about to depart. Id. Therefore, though Bostick's movements were confined, that said nothing about whether or not the police conduct was coercive. Id.

Similarly, not all physical restraints on freedom of movement amount to custody for Fifth Amendment Miranda purposes. Howes v. Fields, __U.S.__, 132 S. Ct. 1181, 1189, 182 L. Ed. 2d 17 (2012). Instead we look to whether the environment presents inherently coercive pressures like those of police-dominated stationhouse interrogation. Id. at 1189-90. For instance, imprisonment, without more, is not enough to constitute Miranda custody. Id. at 1191. Being detained and questioned during a traffic stop is also not considered custody under Miranda, even though it significantly curtails the driver's freedom of action and few motorists would feel free to drive away without permission. Berkemer v. McCarty, 468 U.S. 420, 436-37, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). This is so because a traffic stop is temporary and brief, unlike a prolonged stationhouse interrogation. Id. at 437-38. And, the circumstances of a typical traffic stop are not such that the motorist feels completely at the mercy of the police. Id. at 438.

Here, we must consider whether a reasonable person would have felt free to terminate the encounter at the hospital and decline Trooper Ryan's requests. At the CrR 3.5 hearing, defense counsel introduced another trooper's report that said Pritchard was arrested at the scene. But, Trooper Ryan disagreed with the report and reiterated

8

that Pritchard was not arrested at the scene. The other trooper never testified. Law enforcement did not transfer Pritchard to the hospital. Trooper Ryan did not accompany her there either, but rather arrived around 8:30 p.m., after he had cleared the scene of the accident. Based on this record, we agree with the trial court's finding that Pritchard was not under arrest when she was transported to the hospital.

Pritchard nevertheless contends that being physically immobilized and confined in the hospital room constituted custody. There is no dispute that she was not physically free to leave. But, like Bostick, Pritchard's confinement was unrelated to police conduct. She would not have been free to leave even absent Trooper Ryan's presence. Trooper Ryan entered the emergency room area wearing his uniform, badge, and sidearm. Though his weapon was visible, there is no evidence that he displayed it to Pritchard. Nor is there any evidence that he touched her or came in any physical contact with her that might be considered threatening. His questions were very basic and straightforward. Moreover, after telling Pritchard that he was investigating the collision, Pritchard herself asked him what happened. And, perhaps most importantly, Pritchard declined to take the voluntary sobriety test. This strongly indicates that she felt free to decline Trooper Ryan's requests and terminate the encounter.

Under the Fourth Amendment, a police officer who suspects that a particular person has committed a crime may conduct a "Terry stop" and detain that person briefly to investigate the circumstances provoking suspicion. Berkemer 468 U.S. at 439; see Terry v. Ohio, 392 U.S. 1, 29, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the

9

security of all would be diminished." Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Trooper Ryan's encounter with Pritchard is similar to a Terry stop. He had reasonable suspicion that Pritchard had been drinking and driving, and was entitled to investigate the circumstances provoking his suspicion. Though he suspected a DUI, he wanted to verify that there was not some other innocent cause for the accident, like a medical condition, before arresting Pritchard.

We hold that Pritchard was neither seized nor in custody when Trooper Ryan asked her questions at the hospital before formally arresting her. Though she was not free to leave due to her physical condition, a reasonable person would not have felt that he or she was not free to decline to answer the questions asked. Therefore, the trial court did not err in refusing to suppress Pritchard's pre-Miranda statements on this basis.

B. Voluntariness

Pritchard argues that even if she was not in custody for Miranda purposes, her confession was involuntary and should have been suppressed, because she was highly intoxicated and probably in shock. Similarly, she argues that the trial court's finding of voluntariness did not rest on any specific facts and was improperly based on its finding that she was not under arrest.

Due process requires that a confession be voluntary and not the product of police coercion. State v. Reuben, 62 Wn. App. 620, 624, 814 P.2d 1177 (1991). A coerced confession may not be introduced against a defendant for any purpose. Mincey v. Arizona, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). A confession is coerced if, based on the totality of the circumstances, the defendant's will was

overborne. Id. at 402. We may consider factors such as the defendant's physical condition, age, mental abilities, physical experience, as well as police conduct. State v. Burkins, 94 Wn. App. 677, 694, 973 P.2d 15 (1999). Intoxication alone does not make a defendant's statements involuntary. State v. Saunders, 120 Wn. App. 800, 810, 86 P.3d 232 (2004). Rather, the intoxication must rise to a level of mania where the defendant could not comprehend was she was saying or doing. State v. Cuzzetto, 76 Wn.2d 378, 386, 457 P.2d 204 (1969). We will not disturb a trial court's determination that statements were voluntary if there is substantial evidence in the record from which the trial court could have found voluntariness by a preponderance of the evidence. State v. Broadaway, 133 Wn.2d 118, 129, 942 P.2d 363 (1997).

Pritchard was intoxicated when she told Trooper Ryan at the hospital that she had been drinking. But, Pritchard was able to comprehend Trooper Ryan's questions, follow the conversation, and give clear answers. There is no evidence that Trooper Ryan coerced or pressured Pritchard to talk. Nor is there evidence that he touched her or used a threatening tone. Pritchard remembered that she had three drinks at Traylor's and one earlier in the day, and she expressed that clearly. She did not stammer and Trooper Ryan could understand her. When asked if she had any medical conditions, she responded coherently that she was "pre-diabetic." She declined to take a voluntary sobriety test, indicating that she understood her ability to decline Trooper Ryan's requests. Though Pritchard was immobilized on a backboard, there is no evidence in the record that she was in pain or receiving medical treatment. But cf. Mincey, 437 U.S. at 398-99 (defendant was seriously wounded, suffering from nearly "unbearable" leg pain, showing confusion, and police conduct was coercive). Based on all these facts,

we hold that there is substantial evidence in the record to support the trial court's finding of voluntariness.

Pritchard is correct that the trial court did not enter written findings and conclusions at the CrR 3.5 hearing, but issued only an oral ruling on voluntariness. A trial court's failure to submit written findings and conclusions pursuant to CrR 3.5 is error. State v. Riley, 69 Wn. App. 349, 352-53, 848 P.2d 1288 (1993). But, such error is harmless where the trial court's oral findings are sufficient to permit appellate review. Id. After finding that Pritchard was not under arrest, the court continued:

> And so I will find her statements for at least purposes of [CrR] 3.5 were voluntary. There's testimony she did understand the rights and additionally that her responses were appropriate as opposed to being incoherent and under all those circumstances then I'm going to find that they're voluntary for purposes of [CrR] 3.5.

The court also noted earlier that statements are voluntary if they are not the product of a coercive situation. While not an extensive finding, the court's reasoning includes key considerations in determining whether Pritchard's statements were voluntary. Any error was harmless.

III.  Blood Test Evidence

Pritchard argues that her conviction was based in part on blood test results that were not demonstrably reliable. Specifically, she contends that the prosecution failed to establish that her blood sample was properly preserved with an anticoagulant and an enzyme poison. She requests that we reverse and remand her case for trial with instructions to exclude the blood test evidence.

Before blood alcohol test results can be admitted into evidence, the State must present prima facie evidence that the test chemicals and blood sample are free from

any adulteration that could conceivably introduce error into the test results. State v. Wilbur-Bobb, 134 Wn. App. 627, 630, 141 P.3d 665 (2006). Therefore, to be valid, a blood test must be performed in compliance with Washington Administrative Code (WAC) regulations promulgated by the state toxicologist. RCW 46.61.506(3). WAC 448-14-020(3)(b) requires:

> Blood samples for alcohol analysis must be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration. Suitable preservatives and anticoagulants include the combination of sodium fluoride and potassium oxalate.

In deciding whether to suppress blood alcohol test results, a trial court assumes the truth of the State's evidence and draws all reasonable inferences from it in the light most favorable to the State. RCW 46.61.506(4)(b). Once the State makes a prima facie showing of WAC compliance, the jury determines the weight to give the blood test result. RCW 46.61.506(4)(c).

In State v. Bosio, there was sufficient evidence of an anticoagulant, because a nurse and state trooper saw anticoagulant powder in the vials and the blood did not coagulate. 107 Wn. App. 462, 468, 27 P.3d 636 (2001). But, while there was evidence that federally regulated gray-topped vials were used, there was no evidence that those vials contained an enzyme poison. Id. at 467-68. Thus, the State failed to make a prima facie showing of WAC compliance. Id. at 468. Conversely, in State v. Brown, the State presented evidence that labels on the vials showed the two necessary chemicals. 145 Wn. App. 62, 76, 184 P.3d 1284 (2008). And, a toxicologist testified that the samples would have been clotted and would contain no alcohol in the absence of the two required chemicals. Id. Likewise, in State v. Steinbrunn, the State met its prima

facie burden where a nurse testified that the hospital supplied the vial, and a toxicologist testified that the vial manufacturer always put anticoagulants in the vials it sent to the hospital. 54 Wn. App. 506, 513, 774 P.2d 55 (1989).

In Pritchard's case, vials with gray stoppers were used. Such gray-topped tubes are federally regulated to contain an anticoagulant and an enzyme poison. The WSTL prepares the vials accordingly and distributes them to the Washington State Patrol (WSP). Usually the contents of a particular tube are verified by comparing the tube's lot number with a certificate of compliance kept by the WSP. Here, the tubes' lot number was covered by an evidence label. As a result, the State was unable to produce the tubes' certificate of compliance establishing that they belonged to a batch manufactured and tested to meet the WAC requirements.

However, the State forensic toxicologist who tested Pritchard's blood samples explained that if the vials did not contain an anticoagulant, the blood would be clotted and appear almost solid. Pritchard's blood samples were liquid when tested. As in Brown, this is sufficient evidence to show that the anticoagulant was properly in the blood sample.

The State also introduced chain of custody evidence to show that the vials contained an enzyme poison. The toxicologist testified that the WSTL prepares gray-topped vials in accordance with the WAC and then sends them to the WSP. Trooper Ryan testified that the two gray-topped vials he used were from his office and supplied by the WSP's evidence technician. The vials appeared to be clean, dry, and vacuum sealed. He gave the two vials to the phlebotomist who conducted the legal blood draw in Trooper Ryan's presence. He then took the vials and put them in the WSP's

evidence system to be sent to the WSTL for analysis. The toxicologist testified that the vials arrived in the mail, sealed and unadulterated. And, the State introduced photos of the vials at trial with Trooper Ryan's and the phlebotomist's initials on them. Given all this evidence, we hold that the State met is prima facie burden of demonstrating that the vials contained an enzyme poison as required by the WAC.[5]

Once the State met its prima facie burden, the defense was entitled to challenge the accuracy of the test results, and did so. State v. Straka, 116 Wn.2d 859, 875, 810 P.2d 888 (1991). On cross-examination, the toxicologist admitted that once blood was in the vials, there was no way to verify that an enzyme poison was present without the lot number for comparison. But, she reiterated that it is routine practice for the WSTL to provide the WSP with gray-topped tubes with the appropriate amount of anticoagulant and enzyme poison. The jury was then entitled to determine the weight to give the evidence. RCW 46.61.506(4)(c).

## IV.    Nurse-Patient Privilege and HIPAA

Pritchard argues that testimony from Registered Nurse Tim Peterson, who attended her at the emergency room, violated her nurse-patient privilege. Pritchard challenges two aspects of Nurse Peterson's testimony. First, he testified that Pritchard was admitted to the emergency room around 8:00 p.m. and discharged at 12:10 a.m. Second, he testified that Pritchard did not receive any fluids or medication prior to the legal blood draw.

---

[5] And, the fact that alcohol was detected in Pritchard's blood sample further indicates that an enzyme poison was present to preserve and stabilize the alcohol content of the samples. See Brown, 145 Wn. App. at 76.

Interpretation of a privilege statute is a question of law that we review de novo. Drewett v. Rainier Sch., 60 Wn. App. 728, 731, 806 P.2d 1260 (1991). RCW 5.62.020 provides that, unless the patient consents to disclosure,

> No registered nurse providing primary care or practicing under protocols . . . may be examined in a civil or criminal action as to any information acquired in attending a patient in the registered nurse's professional capacity, if the information was necessary to enable the registered nurse to act in that capacity for the patient.[6]

However, if any violation of Pritchard's nurse-patient privilege occurred, it was harmless. Pritchard contends that the testimony helped clarify the timeline of her blood draw and was relevant to the toxicologist's retrograde extrapolation analysis. But, separate testimony established the time of the accident and the time of Pritchard's legal blood draw, which is the relevant time frame to calculate intoxication under RCW 46.61.502. The State toxicologist also testified that the blood test procedure separates drinking alcohol (ethanol) from other alcohols and compounds found in the blood. Essentially, the testing process eliminates any substances that would interfere with detection of ethanol. The testimony that no fluids or medications had been administered was not necessary to establish the validity of the blood alcohol test. Therefore, none of the challenged testimony was necessary to sustain Pritchard's conviction.

---

[6] But, the State points out that RCW 5.62.020 appears to conflict with RCW 70.02.050(1)(k), which permits disclosure:
> To fire, police, sheriff, or another public authority, that brought, or caused to be brought, the patient to the health care facility or health care provider if the disclosure is limited to the patient's name, residence, sex, age, occupation, condition, diagnosis, estimated or actual discharge date, or extent and location of injuries as determined by a physician, and whether the patient was conscious when admitted.

Pritchard does not respond to the State's argument or discuss RCW 70.02.050(1)(k) anywhere in her briefing. We need not resolve any alleged conflict.

Pritchard also argues that Nurse Peterson's testimony violated her rights under HIPAA. HIPAA restricts health care entities from disclosing protected health information. Lloyd v. Valley Forge Life Ins. Co., No. C06-5325 FDB, 2007 WL 906150, at *3 (W.D. Wash. Mar. 23, 2007). But, HIPPA permits disclosure in judicial proceedings in response to a court order or subpoena, if notice is given and the parties agree to a qualified protective order. 45 C.F.R. § 164.512(e)-(f). Without any further explanation or argument, Pritchard contends that the State failed to follow the correct HIPAA procedures in securing Peterson's testimony. However, the record shows that Nurse Peterson was subpoenaed to testify. And, the court entered a protective order to prevent disclosure of Pritchard's medical records. We find no HIPAA violation.

We find no error affecting the special verdict for driving under the influence or her sentence based on her intoxication level.

We affirm.

_____

WE CONCUR:

_____          _____

17