# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 78554-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| DAVID LAWRENCE HOAR, | |
| Appellant. | |

CHUN, J. — Samantha Ellis died in the apartment she shared with David Hoar, after sustaining multiple head injuries and massive loss of blood. A jury found Hoar guilty of second degree felony murder predicated on assault in the second degree. Hoar claims there was insufficient evidence before the jury to find that he intentionally assaulted Ellis and caused her death. He also challenges the trial court's denial of his motion to suppress statements he made to law enforcement and first responders and raises issues related to legal financial obligations. We affirm the conviction and remand for the trial court to strike the criminal filing fee.

## BACKGROUND

David Hoar and Samantha Ellis were friends who lived in the same apartment complex. In the summer of 2016, after the landlord evicted Ellis from her unit, Hoar allowed her to move into his apartment. Both Hoar and Ellis had long-term, chronic struggles with alcohol.

Citations and pin cites are based on the Westlaw online version of the cited material.

In mid-December 2016, after receiving a second complaint about noise in Hoar's apartment, the apartment manager delivered a ten-day notice to Hoar, requiring him to either remove Ellis or vacate the apartment himself. On December 15, Ellis's mother's birthday, Ellis did not visit her mother or deliver flowers, as she had done before.

On December 19, 2016, Hoar called 911 to report that Ellis had died in his apartment approximately three days earlier. He admitted to the dispatch operator that he should not have waited so long to call for help, but explained that "when you're in love with someone and she passes away, you don't want her to leave you." When emergency medical technicians and law enforcement arrived at the apartment, they found Ellis's body in a prone position on the floor near the bed, beginning to show signs of decomposition. There was dried blood on Ellis's face and on the soles of her feet, and a large amount of blood on the floor surrounding her body. There was blood throughout the apartment on various surfaces, a blood-soaked pillow on the bed, and blood on Hoar's clothing and shoes.

Hoar was visibly intoxicated. He told the responding police officers and fire department personnel that several days before, Ellis fell multiple times and cut her head. He indicated that Ellis mixed prescription medications and alcohol and suggested she might have overdosed. Hoar explained that he had blood on his shoulder because Ellis grabbed him at one point for him to help her up and said he got blood on his pants when Ellis "went down for the last time."

2

Hoar said he had been inside the apartment the entire time in the days after Ellis fell. Hoar also mentioned that Ellis had stopped breathing three or four days previously. When asked why he waited so long before summoning aid, Hoar said he was hoping that Ellis would "wake up."

Hoar volunteered to several responding officers that he did not have a sexual relationship with Ellis. Hoar called his sister after the police left, informed her that Ellis had died, and confessed that he had wanted a romantic relationship with Ellis but she had not felt the same way.

Two days later, the Snohomish County Medical Examiner, Dr. Daniel Selove, performed an autopsy to determine the cause of death. Dr. Selove also reviewed Ellis's medical records, the photographs his office's investigator took at Hoar's apartment, and the blood pattern reports. He also considered Ellis's toxicology report, which did not indicate the presence of alcohol or drugs in her system.

Dr. Selove noted multiple injuries to Ellis's face and head, including an "avulsion injury," where the skin was pulled loose from the bone between Ellis's nose and her forehead. Dr. Selove concluded that this blunt injury was the result of a high velocity impact. In his experience of performing approximately 8,000 autopsies, he had seen such an injury only as a result of being forcefully "stomp[ed]" on or run over by a vehicle. Dr. Selove determined that Ellis sustained at least five separate impacts to face and head, including three deep incisions on the back of her head. Examination of Ellis's brain revealed subdural

3

and subarachnoid bleeding, indicative of blunt force trauma to her head. Dr. Selove concluded that Ellis died as a result of her head injuries and blood loss. Due to the effects of her alcoholism, Dr. Selove opined that Ellis likely experienced fatal blood loss more rapidly than the average person.

Dr. Selove concluded that Ellis's injuries were inflicted upon her, and not accidental. Dr. Selove testified that the concentration of injuries around the face and head was a hallmark of assault. Dr. Selove could not envision a scenario in which accidental falls caused the specific separate impacts Ellis sustained, particularly as to the three closely-spaced injuries at the back of her head. He also determined that the avulsion injury to Ellis's face required an "angled dragging force on the face," and was not the type or severity of injury that would result from falling.

Following the autopsy results, police officers arrested Hoar. Again, Hoar was intoxicated at the time of arrest. After being advised of his rights under Miranda,[1] Hoar agreed to speak with law enforcement. Consistent with his statements two days earlier, Hoar claimed that Ellis fell in the bathroom, kitchen, against the closet door, and finally, by the bed. Hoar described Ellis as his girlfriend and admitted that they argued on the night in question and that he lost his temper. But he denied assaulting her. He explained that he did not call 911 for several days because he believed Ellis would "pull out of it."

Testing later confirmed that Ellis's blood, in the form of both blood transfer stains and blood spatter, was on Hoar's clothing and shoes. When officers later

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

collected a DNA sample from Hoar pursuant to a warrant, they observed several finger-shaped bruises on his back. Hoar explained that Ellis must have grabbed him as she fell. The State charged Hoar with second degree felony murder based on second degree assault.

During the trial, the jury considered the testimony of more than 30 witnesses and 400 exhibits. The jury found Hoar guilty as charged. The court imposed a standard range sentence and ordered certain legal financial obligations (LFOs), including restitution and a $200 filing fee.

## ANALYSIS

### Sufficiency of the Evidence

Hoar challenges the sufficiency of the evidence supporting his conviction. He claims the only evidence supporting the theory that Ellis died as a result of an intentional assault was "equivocal and speculative." Pointing to Ellis's medical history and evidence of prior falls, Hoar claims the evidence supported only the inference that Ellis's injuries resulted from multiple falls in the apartment.

It is the State's burden to prove beyond a reasonable doubt every essential element of a charged crime. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); State v. Vasquez, 178 Wn.2d 1, 6, 309 P.3d 318 (2013). When resolving a challenge to the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime proved beyond a reasonable doubt. State v. Salinas, 119 Wn.2d

192, 201, 829 P.2d 1068 (1992); State v. Garbaccio, 151 Wn. App. 716, 742, 214 P.3d 168 (2009). Direct and circumstantial evidence can be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Credibility determinations are reserved for the trier of fact and are not subject to review. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). And we defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

In order to convict Hoar of murder in the second degree, as charged in this case, the jury had to find that he "committed second degree assault" and thereby "caused the death of Samantha Ellis," and that Ellis was not a participant in the assault. RCW 9A.32.050(1)(b). The instructions further required the jury to find that Hoar assaulted Ellis by "intentionally assault[ing] another and thereby inflict[ing] substantial bodily harm." See RCW 9A.36.021(1)(a). [CP 70] The instructions defined assault as "an intentional touching or striking or cutting of another person that is harmful or offensive regardless of whether any physical injury is done to the person." See State v. Villanueva-Gonzalez, 180 Wn.2d 975, 982-83, 329 P.3d 78 (2014). "A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). The defendant's "'specific criminal intent ... may be inferred from the conduct where it is plainly indicated as a matter of

6

logical probability.'" State v. Goodman, 150 Wn.2d 774, 781, 83 P.3d 410 (2004) (quoting Delmarter, 94 Wn.2d at 638).

It is true that some evidence before the jury was consistent with Hoar's theory that Ellis sustained her injuries by falling repeatedly while she was intoxicated. For instance, a forensic pathologist testified on behalf of the defense and expressed the opinion that the evidence did not provide a basis to rule out either assault or accident. And Hoar emphasizes evidence suggesting that Ellis could have been intoxicated at the time she fell, but fully metabolized the intoxicating substances by the time of her death. He notes that police officers failed to recover a weapon in his apartment or identify any other item that appeared to have been used to strike Ellis.

Relying on State v. Vasquez, 178 Wn.2d at 7, Hoar maintains that equivocal evidence is insufficient to support a criminal conviction. But the presence of conflicting evidence and competing inferences does not mean that the evidence was equivocal. Hoar's argument ignores the framework of our review of the sufficiency of the evidence, which requires that we construe all of the evidence in the light most favorable to the State. The jury was entitled to reject the inferences urged by Hoar and to conclude from the circumstances, including his statements and the fact that he was the only person in the apartment with Ellis and failed to call for assistance for several days, that he intentionally assaulted her and caused the injuries that led to her death. The jury was also entitled to credit the testimony of the medical examiner who testified

without equivocation that Ellis's injuries were not consistent with accidental falls, but were the result of inflicted blunt force trauma. The medical examiner's testimony was not speculative simply because he could not identify the exact mechanism of injury. He definitively concluded, based on the number, location, and types of injuries, that Ellis's injuries were the result of intentional assault. The jury had sufficient evidence before it to convict Hoar of second degree felony murder based on assault.

Motion to Suppress

Hoar contends that the trial court erred by denying his motion to suppress statements made to law enforcement officers and first responders both before and after his arrest. Hoar claims that because he was undisputedly intoxicated, he was unable to knowingly waive his constitutional rights and his statements were, therefore, inadmissible.

Due process requires that a confession must be voluntary and not the product of police coercion. State v. Reuben, 62 Wn. App. 620, 624, 814 P.2d 1177 (1991). A confession is coerced if, based on the totality of the circumstances, the defendant's will was overborne. Mincey v. Arizona, 437 U.S. 385, 402, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). The court considers the totality of the circumstances to determine voluntariness, including the defendant's physical condition, age, mental abilities, experience, and the conduct of the police. State v. Aten, 130 Wn.2d 640, 663-64, 927 P.2d 210 (1996); State v. Burkins, 94 Wn. App. 677, 694, 973 P.2d 15 (1999). We will not disturb a trial

8

court's determination that statements were voluntary if there is substantial evidence in the record from which the trial court could have found voluntariness by a preponderance of the evidence. State v. Broadaway, 133 Wn.2d 118, 129, 942 P.2d 363 (1997).

Under the Fifth Amendment to the United States Constitution and article I, section nine of the Washington Constitution, absent waiver of Miranda rights, a suspect's statements during custodial interrogation are presumed involuntary. State v. Hickman, 157 Wn. App. 767, 772, 238 P.3d 1240 (2010). But a confession is voluntary, and therefore admissible, if after being advised of his constitutional rights under Miranda the defendant knowingly, voluntarily, and intelligently waives those rights. Hickman, 157 Wn. App. at 772. A defendant's waiver is voluntary if it is the product of rational intellect and free will. State v. Brown, 158 Wn. App. 49, 61, 240 P.3d 1175 (2010). In determining voluntariness of such a waiver, we look to the totality of the circumstances, including the defendant's physical and mental condition, experience, and the conduct of the police. Brown, 158 Wn. App. at 61. We review de novo whether a defendant validly waived his Miranda rights. State v. Campos-Cerna, 154 Wn. App. 702, 708, 226 P.3d 185 (2010).

Like other factors, intoxication is relevant, but does not necessarily render custodial statements involuntary or a waiver of Miranda rights invalid. State v. Turner, 31 Wn. App. 843, 845-46, 644 P.2d 1224 (1982); Reuben, 62 Wn. App. at 625-26; State v. Saunders, 120 Wn. App. 800, 810, 86 P.3d 232 (2004). To

9

require such findings, the intoxication must rise to a level of rendering the defendant incapable of comprehending his words and actions. State v. Cuzzetto, 76 Wn.2d 378, 386, 457 P.2d 204 (1969).

Hoar challenges the court's findings, after a CrR 3.5 hearing, that despite his intoxication, his statements were voluntary and he validly waived his constitutional rights. Specifically, Hoar challenges the court's finding that his impairment on December 19 and 21 did not render his statements involuntary:

> Turning then to the issue of intoxication, I find from the evidence that during each of these incidents, the defendant was intoxicated, according to the officers who each would have had sufficient experience to make an accurate determination. However, during each incident he was able to answer questions coherently, was calm, appeared to understand the officer's questions, understood his rights, indicated no major confusion, was not answering incoherently, and despite his intoxication, appears to have been of a state of mind sufficient to be able to understand who he was talking to and what the questioning was about.

The court also found that given Hoar's severe and chronic alcoholism, a blood alcohol test result of .252 at the time of booking, "does not in and of itself, given the direct testimony that he was able to understand the questioning, indicate that he was unable to understand his rights or answer coherently." And the court determined that the recording of Hoar's custodial interview demonstrated that he was properly advised of his constitutional rights and wanted to discuss the incident. The court found that the "interaction between Detective Honnen and the defendant is consistent with Detective Honnen's testimony that he was able to understand the questioning and answer coherently."

10

Hoar argues that because his intoxicated condition was obvious, his statements could not be voluntary. And he argues that any individual with the "remarkably high" blood alcohol level that he had at the time of booking would be unable to knowingly and voluntarily waive his Miranda rights.

Nevertheless, substantial evidence supports the court's finding that Hoar's statements were voluntary. Police officers who interacted with Hoar on both occasions, testified that while he exhibited signs of apparent intoxication, he also understood he was talking to police officers, was responsive, expressed no confusion, and was able to explain "in complete sentences" what had occurred. Detective Honnen testified that during his approximately 30-minute custodial interview, Hoar answered all of his questions responsively and appropriately. An officer also testified that a blood alcohol level of .252 would not affect all individuals in the same manner, and that consistent heavy drinkers "can function and be coherent at a higher BAC level."

As to Hoar's waiver of constitutional rights, the record demonstrates that a police officer informally advised Hoar upon arrival at the police station that he had the right to remain silent and the right to an attorney. Before interviewing him, Detective Honnen advised Hoar of his Miranda rights in full, and Hoar expressly waived them. Hoar did not request the appointment of an attorney, displayed no confusion about his constitutional rights, and indicated that he wanted to discuss the incident with Detective Honnen. Detective Honnen testified as to Hoar's comprehension of the substance and context of the

interview. The totality of the circumstances indicates that Hoar's waiver of his constitutional rights was both knowing and voluntary, despite his intoxication. The trial court did not err in denying Hoar's motion to suppress his custodial and non-custodial statements.

Legal Financial Obligations

Based on legislative changes that became effective shortly after he was sentenced, Hoar challenges the sentencing court's imposition of a $200 filing fee as a part of his judgment and sentence. He also contends that the judgment and sentence must be remanded to clarify that (1) in accordance with recent changes in the law, no interest should accrue on his non-restitution LFOs and (2) social security income may not be used to satisfy LFOs.

However, as the State points out, the record demonstrates that Hoar's LFOs have been satisfied in full. There is nothing to suggest that those obligations accrued any interest or that social security income was used to satisfy them.[2] Accordingly, the question of whether the judgment and sentence should be remanded to clarify interest accrual and/or protection of his social security income, is moot. See State v. Ingram, 9 Wn. App. 2d 482, 490, 447 P.3d 192 (2019) (issue is moot where this court can no longer provide effective relief).

With respect to the criminal filing fee, courts can no longer impose that fee on indigent defendants. See RCW 36.18.020(2). The State concedes that because Hoar receives a part of his income from social security, he is indigent as

---

[2] Although his declaration in support of the order of indigency in the record reported only social security income, it was clear from the record that Hoar received additional income from a trust managed by his sisters.

defined by RCW 10.101.010(3)(a), and that the filing fee should be stricken from the judgment and sentence.  We accept the State's concession.

We affirm the conviction and remand for the trial court to strike the criminal filing fee from the judgment and sentence.

_Chun, J._

WE CONCUR:

_Andrus, A.C.J._          _Appelwick, J._