IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

MICHAEL SHAWN ADAMS,

Appellant.

No. 86841-1-I

DIVISION ONE

UNPUBLISHED OPINION

HAZELRIGG, A.C.J. — Michael Adams appeals his jury conviction for one count each of child molestation in the second degree and incest in the second degree, challenging several rulings of the trial court, primarily evidentiary rulings, and arguing that the issuance of the noncorroboration instruction constituted an improper comment on the evidence. He also assigns error to the court's decision to treat the convictions separately for purposes of his offender score at sentencing and imposition of the victim penalty assessment (VPA). We affirm in part, reverse in part, and remand to strike the VPA.

FACTS

A[1] is a stepchild of Michael Adams. Adams and his wife, Sunshine,[2] were married in September 2018 and they lived together with their three children after

---

[1] The child has a different legal name than that used at trial. This opinion uses the first initial of his chosen name.

[2] Because they share the same last name, we will refer to Michael Adams by his last name and use Sunshine's first name for clarity. No disrespect is intended.

that. Sunshine had two children, including A, when she met Adams, and the couple later had another child together. Adams was involved in A's life since A was about 6 or 7 years old and was the primary father figure in his life before A's biological father, Joseph Taylor, reengaged with his child. Taylor began visitation when A was around 7, and then A split time between Sunshine's and Taylor's homes.

On November 16, 2019, Adams, Sunshine, and the children, including A, who was 13 years old at the time, went to an exhibit at the county fair and had dinner at home. Sunshine had three or four shots of alcohol around 7:00 p.m. after dinner. Adams had been drinking all day. Adams and Sunshine regularly drank after dinner, "not every day, but quite often." After putting the children to bed on the date of the incident, Adams went downstairs and Sunshine went to bed. At around 8:30 p.m., Adams and A were both seated on the couch in the living room, watching TV. At trial, A testified that Adams rested his hand on A's thigh and then, half an hour later, Adams asked A if he would promise not to tell anyone about something. A agreed and Adams then took A's left hand and put it under the robe on his "groin area," and A noted that Adams was not wearing anything underneath his robe. A said that he was "startled" and ripped his hand back, and Adams apologized and asked him not to tell anybody. A panicked and immediately went into the bathroom to text Taylor to come get him. Taylor called 911 to report the incident to the Vancouver Police Department (VPD) and picked A up.

VPD Officer Joshua Sand responded to Taylor's house, and spoke to A and Taylor. Sand took photos of the text messages between A and Taylor about the incident. Sand and VPD Officer Cody Esau then went to Adams' house, and as

they approached the house, they overheard a male voice say, "I don't like anything that happened tonight. And I'm going to go to jail, and I need to call the cops." The male voice the officers heard was later identified as Adams. Sand and Esau then contacted Adams at the front door, who granted them permission to enter the house. When Sand asked Adams if he knew why they were there, Adams responded, "Yes, about the incident with [A]." Adams and Sand spoke for about thirty minutes in the open kitchen and living room area. Adams sat down while Sand stood approximately five feet away; Sand did not restrain Adams' movements in any way or place him under arrest.

During the interview with Sand at his house, Adams initially told Sand that A had cuddled up next to him on the couch before starting to grab Adams' chest, leg, and eventually touching Adams' penis. When Sand asked why A would be startled if A was the one who initiated the touching, Adams responded by saying that "they had a conversation about, you know, how that wasn't okay, and [he] shouldn't do that" and stated, "I wouldn't do that. We weren't—it's not like we were getting hot and heavy on the couch." As the conversation progressed, Sand asked follow-up questions to clarify the situation; Sand asked, "Is that when [A] touched your chest?" and Adams, appearing confused, replied, "Well, that never happened. I never did that." From that point on, Adams repeatedly stated that nothing of the sort had occurred, adding that he had been drinking all day and did not remember everything. Sand then asked Adams if he wanted to provide a written statement and Adams agreed. His first statement was a brief paragraph that did not mention A touching him, and Sand asked him to "include his recollection of what happened

about [A] touching him." Adams took the statement back and wrote another paragraph, but the statement still did not include his interaction with [A] that night. Sand asked again for Adams to include details about his recollection of that night's events. Adams added another sentence that said, "We were uncomfortable when it happened." Sand then asked him again to explain what happened between him and A., and Adams wrote, "[he] touched my pines," spelled p-i-n-e-s. Sand confirmed that "pines" referred to "penis." Adams rewrote his statement three times before Sand accepted and signed it. Adams did not ask for an attorney or request that the questioning stop. The officers did not arrest Adams that evening.

On December 4, 2019, VPD Detective Jim Azinger called Adams and asked him to come to the VPD station to discuss the matter further. When Adams arrived, Azinger formally arrested him and read him *Miranda*[3] warnings from Azinger's department-issued card, which stated,

> You have the right to remain silent. Anything you say can be used against you in a court of law. You have a right at this time to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.

Azinger then asked Adams the following two questions: "Do you understand each of the rights I have explained to you?" and, "Having these rights in mind, do you wish to talk to me at this time?" Adams replied "Yes" to both questions. After that, Azinger turned on the audio and video recording device, informed Adams that he was under arrest, explained the charges against him, and then read the *Miranda*

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

warnings again. As he had during the initial interview with Sand, Adams asserted to Azinger that he had been drinking all day before the incident. He also stated that A was wearing a bathrobe that exposed his bare chest and he told A to cover himself before he sat down next to Adams. Adams claimed to have fallen asleep on the couch, only to wake up when A suddenly got up and said he needed some air. At one point, Adams requested to speak to an attorney and Azinger ceased questioning. The State charged Adams with one count each of child molestation in the second degree and incest in the second degree for the same act committed against A on November 16, 2019.

Before trial, Adams moved to suppress both the signed statement and the video interview, claiming that the written statement had been coerced and the interview with Azinger was inadmissible because of the detective's failure to comply with CrR 3.1. The court conducted a hearing under CrR 3.5 on May 12, 2022 to determine the admissibility of Adams' statements to police and Esau, Sand, and Azinger all testified. Sand said that Adams did not appear to be under the influence of drugs or alcohol, although he seemed flustered, cried, fidgeted, and avoided making eye contact. He further testified that Adams cooperated with the interview and did not seem disoriented. Sand also confirmed that he neither threatened nor promised anything to Adams during their interaction. Azinger admitted at the CrR 3.5 hearing that he failed to read Adams the following warning that was also printed on his department-issued card: "You have the right to counsel. If you are unable to pay for counsel, you're entitled to have one provided without charge." He acknowledged that his card instructed him, "Regardless of

*Miranda* applicability, Washington State requires that the following advisement be given to every person taken into custody." Azinger stated that he "never read the back side" of the card because "based on [his] training," he did not believe it was necessary.

The trial court denied Adams' motion to suppress and both the written statement and videotaped interrogation were admitted at trial. On February 16, 2023, the jury found Adams guilty on both counts. Adams submitted a sentencing memorandum that asked the court to treat the two counts as same criminal conduct for purposes of calculating his offender score. On March 3, the trial court found the crimes were not the same criminal conduct and sentenced him to 34 months in prison, followed by 36 months of community custody. The court found Adams was indigent, but imposed the VPA and DNA collection fee, which were both mandatory at the time.

Adams timely appealed.

ANALYSIS

I.     Admission of Written Statement

Adams challenges the trial court's admission of the written statement that he was asked to supplement three times (Exhibit 2). He contends that the statement was involuntary, the result of police coercion, and implies that his intoxication contributed to its involuntariness. We agree.

During oral argument before this court, the State conceded that the findings of fact and conclusions of law entered after the CrR 3.5 hearing were prepared by

the State and signed by the judge without modification.[4]  Under CrR 3.5, it is the court's responsibility to create a clear and independent record of its findings and conclusions.  While it is common practice for the prevailing party to prepare proposed findings and conclusions, the court must review them for accuracy and correct them as needed prior to entry.  Here, the trial court adopted the following findings of fact:

> 1.5    Officer Sand indicated the Defendant did not appear to be under the influence of any substances.
>
> . . . .
>
> 1.7    Officer Sand asked clarifying questions regarding the statement based on the prior interview. Defendant made additions to the statement.
>
> 1.8    Officer Sand did not request that the Defendant change his statement.

The trial court made the following conclusions of law:

> 2.3    Viewing the totality of the circumstance surrounding Officer Sand[']s interview in Defendant's home on November 16, 2019, the court finds the interview was not coercive and was not in custody. The statements are admissible under CrR 3.5.
>
> 2.4    The written statement made by Defendant on November 16, 2019 was voluntarily made and is therefore admissible.

At the time the court entered its CrR 3.5 findings, Adams objected to findings of fact (FF) 1.7 and 1.8.  On appeal, he assigns error to FF 1.5, 1.7, and 1.8, and conclusions of law (CL) 2.3 and 2.4.

---

[4] Wash. Ct. of Appeals oral arg., *State v. Adams*, No. 86841-1-I (Nov. 5, 2024), at 10 min., 20 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024111115/?eventID=2024111115.

A.    Standard of Review on Motion to Suppress

On appeal from a ruling on a motion to suppress, we review the trial court's conclusions of law de novo.  *See State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999), *abrogated on other grounds by Brendlin v. California*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)).  When reviewing the denial of a suppression motion, an appellate court evaluates whether substantial evidence supports the challenged findings of fact and whether the findings support the conclusions of law.  *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).  Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.  *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999).  "[F]indings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged; and, if challenged, they are verities if supported by substantial evidence in the record."  *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997).

"Whether a confession is free and voluntary is not determined by whether the officer's conduct is shocking or the confession is cruelly extorted, but whether it was extracted by any sort of threat, violence, or direct or implied promises, however slight.  A confession that is product of coercion, physical or psychological, is involuntary and not admissible."  *State v. Riley*, 17 Wn. App. 732, 735, 565 P.2d 105 (1977); *see also Rogers v. Richmond*, 365 U.S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961).  The Fifth Amendment to the United States Constitution guarantees the right against compelled self-incrimination, which requires police to inform a suspect of their *Miranda* rights before a custodial interrogation.  *State v.*

- 8 -

*Cunningham*, 116 Wn. App. 219, 226, 65 P.3d 325 (2003). To determine whether the suspect is in custody, courts apply an objective test: "whether a reasonable person in a suspect's position would have felt that [their] freedom was curtailed to the degree associated with a formal arrest." *State v. Heritage*, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). In contrast, a routine investigative encounter, supported by reasonable suspicion, does not require *Miranda* warnings. *See, e.g., State v. Hilliard*, 89 Wn.2d 430, 573 P.2d 22 (1977); *State v. Mercer*, 45 Wn. App. 769, 727 P.2d 676 (1986); *State v. Phu Huynh*, 49 Wn. App. 192, 201, 742 P.2d 160 (1987). Investigative encounters are not inherently coercive since they are temporary, brief, and typically less "police dominated." *State v. Walton*, 67 Wn. App. 127, 130, 834 P.2d 624 (1992); *see also State v. Hensler*, 109 Wn.2d 357, 362-63, 745 P.2d 34 (1987).

### 1. Findings of Fact and Substantial Evidence

Here, we review the trial court's decision after a CrR 3.5 hearing by examining whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law. Adams claims that the trial court did not explicitly apply the totality of circumstances test and ultimately made findings unsupported by the record. He contends that his statement should have been suppressed because FF 1.7 and 1.8 are not supported by substantial evidence. The State argues that mere requests for clarification do not amount to coercion. The State further asserts that substantial evidence supports FF 1.7 and 1.8 because the heading of the statement form that Adams signed stated the following: "I, Michael Adams, . . . make the following statement of my own free will

and accord. No threats, promises, or offers of gratuity or immunity have been made to me nor was violence used in obtaining this statement of facts." The preprinted language on a written statement form, signed by a person who repeatedly and consistently asserted he had been drinking, is not determinative here. Again, the challenged FFs are:

> 1.5 Officer Sand indicated the Defendant did not appear to be under the influence of any substances.
>
> . . . .
>
> 1.7 Officer Sand asked clarifying questions regarding the statement based on the prior interview. Defendant made additions to the statement.
>
> 1.8 Officer Sand did not request that the Defendant change his statement.

In briefing, Adams effectively admits that FF 1.5 is supported by the record, recognizing that "it is true Officer Sand said [Adams] 'did not appear to be intoxicated.'" Again, Adams claims that he had been drinking all day and Sand repeatedly asked him to include details he was reluctant to provide in his written statement. Sand and Esau both testified that they did not observe signs of impairment,[5] but their testimony was also consistent that Adams did in fact tell

---

[5] Sand also testified that while he has been trained to recognize intoxication, unless "the case specifically involves that," offering as an example the investigation of suspected driving while under the influence, it would not be part of his investigation to determine if someone was intoxicated. As to this case in particularly, he said "at the time it didn't seem like it was something I needed to know or investigate more thoroughly." His assertion on this point is objectively incorrect.

Assessing a person's level of intoxication is often relevant and appropriate in all manner of criminal cases as it can affect the credibility of statements, the voluntariness of consent, and the ability to recall events accurately. *See State v. Cuzzetto*, 76 Wn.2d 378, 457 P.2d 204 (1969) (intoxication may render statements to law enforcement involuntary); *State v. Russell*, 125 Wn.2d 24, 82-85, 882 P.2d 747 (1994) (evidence of intoxication by drug use at time of incident that is the subject of testimony may be used to impeach witness credibility); *State v. Thomas*, 123 Wn. App. 771, 776-82, 98 P.3d 1258 (2004) (explaining legal distinctions between affirmative defenses of diminished capacity and voluntary intoxication); *State v. Meza*, 26 Wn. App. 2d 604, 623, 529 P.3d

- 10 -

Sand that he had been drinking that day. FF 1.5 is rooted in Sand's own *perception* of Adams and does not indicate that Adams had *not* consumed alcohol, only that Sand did not believe that Adams was impaired at the time of the initial interview. FF 1.5 rests upon Sand's testimony and is therefore supported by substantial evidence.

With regard to FF 1.7, which reads, "Officer Sand asked clarifying questions regarding the statement based on the prior interview. Defendant made additions to the statement," Adams points out that Sand testified he asked "clarifying" questions during their conversation, *before* asking Adams to write a statement. Adams asserts that it was in response to these clarifying questions that he said he did not remember A grabbing his penis. Adams is correct that the court's finding that Sand only asked clarifying questions does not clearly or comprehensively capture Sand's own testimony regarding the amendments of Adams' written statement. The following exchange occurred during Sand's direct examination at the CrR 3.5 hearing:

> [State]: Did you—did he make the initial writing—or did he write it out himself?
>
> [Sand]: Yes.
>
> [State]: When you reviewed it, was it consistent with what he had told you at that point?
>
> [Sand]: So he wrote—the first thing he wrote was a pretty short paragraph, and it didn't have any of the information regarding [A]

---

398 (2023) (fact of decedent's intoxication, supported by testimony about toxicology from medical examiner, was critical evidence in self-defense to murder charge).

Police officers tasked with the investigation of crimes for prosecution by the government should be educated on the signs of impairment, document them when observed, and consider apparent intoxication whenever it may impact the circumstances or the interpretation of the person's actions and statements.

grabbing his penis, which I felt was an important thing to note since he had told me his statement. So I was like, "Hey, you should put something in there—you know, whatever statement you want to make about that, make sure that's in there because that's an important part to your statement." So he took it back and he wrote another paragraph.

And he said, "I'm finished," and handed it to me. I reviewed it again. And a second time it didn't state anything about his interaction with [A] that night. So I just confirmed again. I was like, "This is—well, why I need your statement is your recollection of events happening tonight."

So he said he—he would do it again, and he wrote down, I believe, a sentence that said, "We were uncomfortable when it happened."

I asked him again, "You're not explaining what happened between you and [A] as far as [A] touching and grabbing you."

So he grabbed it one more time and wrote down, "[A] touched my pines, p-i-n-e-s." I confirmed with him what that meant, and he said that—that [A] had touched his penis.

. . . .

[State]: And you asked some clarification questions, but did you make any threats or—or promises as he wrote that?

[Sand]: No. I—I strictly just asked him, "I—we need your statement about the specific situation. So just write whatever you want about what your statement—what you want your statement to be."

This testimony shows that Sand did ask Adams clarifying questions and therefore supports FF 1.7.

However, Sand's own testimony, which supports FF 1.7, directly and repeatedly contradicts FF 1.8. While the court made no express credibility findings with regard to Sand or Esau's testimony, the findings that were entered establish that it found both to be credible. As such, we grapple with the extensive testimony from Sand, elicited by both the prosecutor and Adams' counsel, that undercuts FF 1.8. Sand's own testimony establishes that he repeatedly requested amendments to the *voluntary* written statement because the first three versions did not satisfy

- 12 -

him.  This is despite the fact that Sand later testified on redirect that the purpose of obtaining a written statement from a witness or suspect is for "whoever is writing the statement to put in what *they want*—I guess, what *legally they want their official statement to be* to the police."  (Emphasis added.)  On cross-examination, Sand made the following admissions:

> [Defense]: So why did you have him rewrite his statement twice?
>
> [Sand]: I believe it was four times I had him add to his statement because he wasn't explaining the actual situation that happened with [A].
>
> [Defense]: So first you gave him a chance to write a voluntary statement; isn't that right?
>
> [Sand]: Correct.
>
> [Defense]: You didn't like it or you weren't satisfied because it didn't suit your purpose, so you had him do it again.
>
> [Sand]: Well, I told him that what—what he first told me, that [A] had touched his penis, was an important part of the investigation and him not putting in that or him saying that he forgot or he doesn't remember or it didn't happen—that his statement about his recollection of those events was important, and I wanted him to put that in there.
>
> [Defense]: Okay. So he tried again, but it still didn't satisfy you so you had to write him a third time [sic], correct?
>
> [Sand]: Correct.
>
> [Defense]: Right? And then that still didn't satisfy you so you had him write a fourth time.
>
> [Sand]: *Correct*.

(Some alterations in original) (emphasis added).  And on re-cross-examination, Sand again conceded that his insistence on the revisions was in furtherance of his

goal of obtaining a particular response from Adams. Defense counsel inquired about the statement after the final revision, where Adams added that A touched his penis, and asked, "You were satisfied for your purposes and you felt like you could leave at that point?" Sand responded, "I felt like we had his *sufficient* statement and we left." (Emphasis added.) He had finally obtained not "what [Adams] legally…want[ed his] official statement to police to be," but a statement that Sand felt was "sufficient" for his investigation. On further re-cross-examination, Sand provided a contradictory final answer:

> [Defense]: Isn't it fair to say that you wanted him to write what you wanted him to write?
>
> [Sand]: No, not what I wanted him to write. But *I wanted him to explain* what he remembers about [A] touching his penis.

(Emphasis added.) Careful review of the transcript of the CrR 3.5 hearing clearly establishes that FF 1.8 is not only unsupported by substantial evidence, it is directly contradicted.

### 2. De Novo Review of Conclusions of Law

We next consider whether the conclusions Adams challenges, CL 2.3 and 2.4, are reasonably supported by the findings of fact for which there is substantial evidence. Again, they read as follows:

> 2.3 Viewing the totality of the circumstance surrounding Officer Sand's interview in Defendant's home on November 16, 2019, the court finds the interview was not coercive and was not in custody. The statements are admissible under CrR 3.5.
>
> 2.4 The written statement made by Defendant on November 16, 2019 was voluntarily made and is therefore admissible.

First, without explicitly so stating, these two conclusions appear to separately refer to the verbal statements Adams made to Sand and Esau, and the written statement ultimately admitted as Exhibit 2. Next, CL 2.3 is framed as a finding of fact in that the court, by adopting the findings and conclusions drafted by the State without modification, expressly notes that "the court *finds* the interview was not coercive." (Emphasis added.) However, because CL 2.3 ends with a number of legal conclusions, we nonetheless consider it de novo.

The record contains unchallenged findings that establish Adams granted Sand and Esau permission to enter his home, the interview was conducted in the kitchen, and the officers did not restrict Adams' movements. Unchallenged findings are verities on appeal. *See Broadaway*, 133 Wn.2d at 131. It is also true Sand and Esau both testified that they were in uniform and armed during their contact with Adams in his home and, under those circumstances alone, a reasonable person in Adams' position might have felt that their freedom was restricted to the degree associated with a formal arrest, particularly if they were under the influence.[6] *State v. Watkins*, 53 Wn. App. 264, 274, 766 P.2d 484 (1989). In fact, Sand testified that, at one point, before he asked for a written statement, Adams stated, "Well, you can just take me to jail because I'm . . . ." Nonetheless, reading this conclusion as solely addressing the verbal statements Adams made to Sand prior to the invitation to provide a written statement, CL 2.3

---

[6] While we conclude, and Adams conceded in briefing, that FF 1.5 is supported by Sand's testimony, we note that Adams does not cite any case law to link his alleged intoxication to police coercion that would undercut the trial court's conclusion of law on this issue. The only relevant case he offers is *State v. Unga*, which discusses factors *potentially* relevant in a totality of the circumstances analysis, such as the defendant's physical condition. 165 Wn.2d 95, 101, 196 P.3d 645 (2008). Again, FF 1.5 merely reflects the perceptions of the officer and appears to have been appropriately considered by the trial court in reaching this conclusion of law.

is supported by appropriate findings of fact and those statements to which Sand and Esau testified at trial were properly admitted.

Applying the totality of the circumstances test to the record from the trial court, including the supported findings, we hold that CL 2.4 does not reasonably flow from the facts established at the CrR 3.5 hearing. While it is true that Adams' written statement was not extracted by any act of violence or explicit threat or direct or implied promises, the record establishes that Sand's consistent pressure and redirection influenced Adams' three revisions. *Riley* notes psychological factors can affect voluntariness of the suspect's statements. 17 Wn. App. at 735. As set out in detail in section 1., *supra*, there is extensive testimony from Sand, elicited on both direct and cross-examination, that establishes that the portion of the interview in Adams' home regarding the written statement was coercive and the document ultimately admitted as Exhibit 2 was not "voluntarily made." Therefore, Exhibit 2 was not admissible and should have been suppressed.

B.     Harmless Error Analysis

Adams argues the erroneous admission of Exhibit 2 should be evaluated under the constitutional harmless error standard and that reversal is required because it was not harmless beyond a reasonable doubt.

"[I]f trial error is of constitutional magnitude, prejudice is presumed and the State bears the burden of proving it was harmless beyond a reasonable doubt." *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013). Here, the error is of constitutional magnitude as it implicates Adams' constitutional right against self-incrimination. To determine whether the same verdict would have been reached,

this court considers the "'untainted evidence admitted at trial to determine if it is so overwhelming that it necessarily leads to a finding of guilt.'" *State v. Thompson*, 151 Wn.2d 793, 808, 92 P.3d 228 (2004) (quoting *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)).

Adams contends that had his written statement to Sand been suppressed, the State would not have been able to argue at trial that Adams made multiple conflicting statements, and there would have been no inference with which to undermine Adams' credibility. However, Adams fails to address how admission of Exhibit 2 specifically affected the outcome of the trial, given that Sand was able to testify to the entirety of the initial interview, prior to the request for a written statement, during which Adams gave multiple versions of events. This is compounded by Azinger's testimony about the custodial interrogation at the police station, where Adams' recollection of events varied even further. Additionally, Sand testified that he was unable to identify the various revisions within the written statement, so the document itself apparently did not reflect the different additions that Adams made after each of Sand's repeated requests for supplementation.

During oral argument before this court, Adams challenged the manner in which the evidence was presented to the jury, criticizing the "theatrics in court" when Sand opened a sealed evidence envelope and unveiled the written statement in open court.[7] However, he did not explain how these purported theatrics ultimately impacted the outcome of the trial. In response, the State averred that there was nothing improper about this method of trial advocacy and

---

[7] Wash. Ct. of Appeals oral arg., *supra,* at 5 min., 22 sec.

under any combination of suppression, either admission of the video interview with Azinger or the written statement to Sand and Esau, the outcome of trial would have remained the same. The State pointed out that Adams made six conflicting statements in total: two verbal statements to Sand, one written statement, one to Sunshine to which she testified at trial, one to Azinger, and his own trial testimony.[8] The State is correct. Each of these statements provided ample grounds for the State to argue that Adams was inconsistent and, thus, lacked credibility. In light of this record, even without Exhibit 2, sufficient evidence existed for the State to highlight Adams' conflicting statements and impeach his credibility, particularly in comparison to A's version of events, which remained consistent from the first report to Taylor through testimony at trial. Because the untainted evidence admitted at trial was overwhelming and necessarily led to a finding of guilt, we hold that the admission of the written statement was harmless beyond a reasonable doubt.

II.    Notice of Right to Counsel

Adams next relies on CrR 3.1 to argue that his videotaped interrogation should have been suppressed and his statement to Azinger was inadmissible because the *Miranda* warnings from Azinger's department-issued card did not explicitly advise Adams of his right to a lawyer and, if he could not afford one, counsel would be provided at public expense. Specifically, he assigns error to FF 1.12, which states, "Detective Azinger read the *Miranda* warnings from his department issued card." He further challenges CL 2.6 that states, "No case law

---

[8] Wash. Ct. of Appeals oral arg., *supra,* at 15 min., 46 sec. to 16 min., 13 sec.

was provided to support that the additional warnings in the back of the [d]etective's *Miranda* card was necessary in this case." The State argues that Azinger's failure to read the extra warnings on the back of his card does not invalidate the *Miranda* warnings, which comply with CrR 3.1. We agree with the State.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." Similarly, article I, section 9 of the Washington State Constitution is interpreted consistently with the Fifth Amendment and requires equivalent protections. *See State v. Schoel*, 54 Wn.2d 388, 390, 341 P.2d 481 (1959). The Sixth Amendment to the United States Constitution guarantees the right to assistance of counsel in all criminal prosecutions, and Washington's Constitution, article I, section 22, provides the same right. *See State v. Templeton*, 148 Wn.2d 193, 208-09, 59 P.3d 632 (2002). CrR 3.1(b)(1) states that the "right to a lawyer shall accrue as soon as feasible after the defendant has been arrested, appears before a committing magistrate, or is formally charged, whichever occurs earliest." The State cannot admit statements made by an accused person during custodial interrogation unless there were "procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444.

Here, Adams does not contest that he was read his *Miranda* rights at the time of his arrest. However, he asserts that Azinger failed to immediately advise him of his right to an attorney and the right to have an attorney appointed if he could not afford one. Azinger testified at the CrR 3.5 hearing that he read the following statement verbatim from his department-issued card:

> You have the right to remain silent. Anything you say can be used against you in a court of law. You have a right *at this time* to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements.

(Emphasis added.) As a preliminary matter, CL 2.6 is not a conclusion of law. Again, it reads, "No case law was provided to support that the additional warnings in the back of the [d]etective's Miranda card was necessary in this case." This is not a statement of the law, but of a procedural fact of this case; it merely conveys that neither party provided case law holding that the CrR 3.1 advisement must be given to a suspect prior to an interview or interrogation. In this context, we "review a mislabeled finding of fact or conclusion of law for what it really is." *State v. Taylor*, 29 Wn. App. 2d 319, 330, 541 P.3d 1061, *review denied*, 3 Wn.3d 1003 (2024). We apply the substantial evidence standard for a mislabeled conclusion of law that is actually a finding of fact. *See State v. Conway*, 8 Wn. App. 2d 538, 551-52, 438 P.3d 1235 (2019). Careful review of the record establishes that this accurately reflects the argument of the parties on this issue. Azinger testified that he read the *Miranda* warnings to Adams verbatim from his card. Accordingly, both FF 1.12 and the mislabeled CL 2.6 are supported by substantial evidence.

Both the State and Adams cite *State v. Templeton* to address the proposition that a valid waiver under *Miranda* does not serve the same purpose as a waiver under CrR 3.1(b)(1). But only the State further argues that *Templeton* specifically states that *Miranda* advisements satisfy CrR 3.1 if they include "at this time" in the phrase "you have the right to an attorney." 148 Wn.2d at 218-20. Again, Azinger's advisement here included that specific language, "You have the

- 20 -

right *at this time* to an attorney." (Emphasis added.) But Adams's reply brief fails to address how the phrase "you have the right at this time to an attorney" from *Templeton* impacts his claim that his right to counsel was violated under CrR 3.1. In fact, at oral argument before this court, Adams conceded as much when the court expressly noted the lack of response to the State's argument under *Templeton* that CrR 3.1 is satisfied by the inclusion of the words "at this time." Counsel stated:

> Yes. . .*Templeton* does state that.[9] And I think in this particular case, if we look at the facts, the fact that the interview was terminated when Mr. Adams said, I cannot afford an attorney. The issue here is the fact that he wasn't able to afford an attorney. And the *Miranda* warning does, did not inform Mr. Adams that he would be immediately provided an attorney at no cost to him.[10]

Because the department-issued *Miranda* advisements satisfy the requirements of CrR 3.1, and Adams appropriately conceded that *Templeton* so holds, the trial court did not err when it admitted Adams' videotaped custodial interview.

III.     Noncorroboration Instruction

Adams also challenges jury instruction 13, which provided that "it is not necessary that the testimony of the alleged victim be corroborated" in order for the jury to return a guilty verdict. He objected to the instruction at trial, arguing that it

---

[9] Wash. Ct. of Appeals oral arg., *supra,* at 9 min., 10 sec.

[10] Adams continued this line of argument in rebuttal and asserted, without citation to authority, that a person subject to *Miranda* warnings must also be advised as to *how* that attorney will be paid, in order to assure that the person subject to interrogation does not mistakenly believe that they will later be billed for such representation. Specifically, counsel explained that "the intent [of CrR 3.1] is to make sure that it is crystal clear in layman's terms that there is no doubt that. . .a person in this situation will be given an attorney at no cost and that they don't have to bear that financial burden [] themselves in order to assert their rights." *Id.* at 22 min., 13 sec.

CrR 3.1(c)(1) only says that "it shall be stated expressly that a person who is unable to pay a lawyer is entitled to have one provided without charge" and does not contain language capturing the requirement counsel urges. We decline to read such a requirement into the rule.

was a matter of sufficiency of the evidence and it would be a negative instruction, which unnecessarily "give[s] the State kind of a head start." The prosecutor argued that it is helpful to explain to the jury that the State is not required to show corroboration and it is a correct statement of the law. The court overruled Adams' objection, noting that the instruction is a correct statement of the law given the theory of the case that the State had articulated. On appeal, Adams asserts that jury instruction 13 constituted an improper judicial comment on the evidence. We disagree.

We review alleged error in the jury instructions de novo. *State v. Sibert,* 168 Wn.2d 306, 311, 230 P.3d 142 (2010). The Washington Constitution provides that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. This provision prohibits a judge from expressing to the jury their personal opinions toward the merits of the case or directing that a factual issue has been established as a matter of law. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). A jury instruction can be a comment on the evidence if it demonstrates that the court has a particular attitude toward the merits of the case. *State v. Hermann*, 138 Wn. App. 596, 606, 158 P.3d 96 (2007). To determine whether a trial court's statement amounts to a comment on the evidence, we "look to the facts and circumstances of the case." *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). The fundamental question underlying our analysis is whether the mention of a fact in a jury instruction "conveys the idea that the fact has been accepted by the court as true." *Levy*, 156 Wn.2d at 726; *State v. Zwald*, 32 Wn App. 2d 62, 69, 555 P.3d

467 (2024). However, a jury instruction that accurately sets out the law on a particular matter is not an improper judicial comment on the evidence. *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015); *State v. Yishmael*, 6 Wn. App. 2d 203, 213, 430 P.3d 279 (2018), *aff'd*, 195 Wn.2d 155, 456 P.3d 1172 (2020). Our Supreme Court has consistently held that a noncorroboration jury instruction does not amount to a judicial comment on the evidence. *See, e.g, State v. Clayton*, 32 Wn.2d 571, 572-73, 202 P.2d 922 (1949); *State v. Thomas*, 52 Wn.2d 255, 256, 324 P.2d 821 (1958).

We reject Adams's challenge on this issue because the non-corroboration jury instruction mirrored the applicable statute with which Adams was charged. RCW 9A.44.020(1) reads as follows:

> In order to convict a person of any crime defined in this chapter it shall not be necessary that the testimony of the alleged victim be corroborated.

Here, the trial court gave the following jury instruction:

> In order to convict a person of the crime of Child Molestation in the Second Degree and/or Incest in the Second Degree as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated.

The jury instruction is an accurate reflection of the relevant law and established jurisprudence clearly provides that such an instruction does not constitute an impermissible judicial comment.

Adams, however, asserts that in instruction 3, the court informed the jury, "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence." He contends that by also providing instruction 13, the judge singled out one instance of a "lack of evidence" the jury could not

question: A's accusation based on the lack of corroboration. Adams is arguing that instruction 3 read in conjunction with jury instruction 13 is a comment on A's credibility. He further avers that while the lack of evidence can create a reasonable doubt in most instances, instruction 13 told the jury the lack of corroboration here could not.

Adams' argument overlooks controlling case law on noncorroboration jury instructions. This court has consistently upheld noncorroboration instructions as non-prejudicial and not constituting impermissible judicial comment, including the recent *Zwald* opinion that reinforces this principle. Here, we adhere to established case law and conclude that jury instruction 13 is consistent with RCW 9A.44.020(1) and is not an impermissible judicial comment.

IV.    Sufficiency of the Evidence Regarding Sexual Gratification

Adams next argues that the State failed to prove that any physical contact that occurred between him and A was done for sexual gratification. The State contends that the touching was not accidental and that it could only have been perpetrated for sexual gratification. We agree with the State.

We review sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). "When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any

less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

We look to the totality of the facts and circumstances presented in determining whether the sexual contact element has been satisfied. *State v. Harstad*, 153 Wn. App. 10, 21, 218 P.3d 624 (2009). "Contact is 'intimate' within the meaning of the statute if the conduct is of such a nature that a person of common intelligence could fairly be expected to know that, under the circumstances, the parts touched were intimate and therefore the touching was improper." *Id*. at 21 (quoting *State v. Jackson*, 145 Wn. App. 814, 819, 187 P.3d 321 (2008)). Adams argues that the State is required to prove beyond a reasonable doubt that the sexual contact was for purposes of sexual gratification and the State did not prove anything by simply insisting there could be "no other purpose" for it. RCW 9A.44.086(1), defines child molestation as follows:

> A person is guilty of child molestation in the second degree *when the person has . . . sexual contact* with another who is at least twelve years old but less than fourteen years old and the perpetrator is at least thirty-six months older than the victim.

(Emphasis added.) Incest is defined, in pertinent part, by RCW 9A.64.020(2)(a), which reads:

> A person is guilty of incest in the second degree if [they] engage[] in *sexual contact* with a person whom [they] know[] to be related to [them], either legitimately or illegitimately, as an ancestor, descendant, brother, or sister of either the whole or the half blood.

(Emphasis added.) RCW 9A.44.010(13) defines "[s]exual contact" as "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." While "sexual gratification

- 25 -

is not an explicit element of second-degree child molestation, the State must prove a defendant acted for the purpose of sexual gratification." *State v. Stevens*, 158 Wn.2d 304, 309-10, 143 P.3d 817 (2006). Sexual gratification can be inferred from the nature and circumstances of the act itself. *State v. Tilton*, 111 Wn. App. 423, 430, 45 P.3d 200 (2002), *vacated on other grounds*, 149 Wn.2d 775, 72 P.3d 735 (2003).

Adams relies on *State v. Vasquez* to argue that "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." 178 Wn.2d 1, 16, 309 P.3d 318 (2013). The State charged Vasquez with two counts of forgery and our Supreme Court vacated one forgery conviction due to insufficient evidence of his intent to injure or defraud. *Id*. at 4. *Vasquez* does not explain how the facts in the present case do not support an inference that the contact was accomplished for purposes of sexual gratification. On the contrary, the evidence presented allows a reasonable jury to conclude that Adams' actions were intended to promote sexual gratification. Specifically, A testified that Adams asked if he could try something before taking A's left hand and placing it under his robe, directly onto his groin area. Additionally, Adams' apology and request for secrecy, and his instruction that A not tell anyone what happened, support an inference of intent to derive sexual gratification from the contact. Evidence of regret and concealment suggest to the jury that Adams understood the nature of the act and intended to keep it private. When viewed in totality, A's testimony provides ample basis for the jury's conclusion that Adams' conduct was sexually

motivated.  We conclude the State presented sufficient evidence to prove sexual contact.

V.     Same Criminal Conduct

Adams next assigns error to the court's decision to treat child molestation and incest separately for purposes of sentencing.  The court found that, although both counts occurred at the same time, in the same place, and involved the same victim, they do not constitute the same criminal conduct due to the difference in intent required under the respective statutes.  The court cited *State v. Chenoweth*, 185 Wn.2d 218, 370 P.3d 6 (2016), in making its decision.

Crimes constitute the same criminal conduct when they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a).  Unless all elements are present, the offenses must be counted separately.  *Chenoweth*, 185 Wn.2d at 219; *State v. Porter,* 133 Wn.2d 177, 181, 942 P.2d 974 (1997).  Our Supreme Court has held that rape of a child and incest are separate crimes because they involve distinct criminal intents.  *See, e.g., State v. Bobenhouse,* 166 Wn.2d 881, 896, 214 P.3d 901 (2009); *State v. Calle,* 125 Wn.2d 769, 780, 888 P.2d 155 (1995).  However, Adams argues that sentencing in his case occurred before the Supreme Court opinion in *State v. Westwood*[11] which, when applied to the present case, establishes that child molestation and incest have the same "objective intent."  There, our Supreme Court considered whether the defendant's convictions for assault in the first degree, attempted rape in the first degree, and burglary in the first degree

---

[11] 2 Wn.3d 157, 167, 534 P.3d 1162 (2023).

constituted the same criminal conduct. *Westwood,* 2 Wn.3d at 168. In doing so, it relied on the statutory definitions of the crimes to determine objective intent. *Id.* at 167. "The statutory intent is relevant in determining whether the objective intent prong is satisfied. Looking to any other source of intent has the potential to lean too closely to the subjective analysis that we have always rejected." *Id*. Because the statutory definitions of intent for each crime were different, the Supreme Court held that Westwood's crimes did not have the same objective intent. *See id.* at 168-69.

Adams argues that under the reasoning set out in *Westwood*, the trial court erred in finding the "objective intent" between the two crimes was different. He further asserts that *Chenoweth* is distinguishable from the instant case because the intent in both child molestation and incest is the same, to have "sexual contact," and the jury instruction defined "sexual contact" identically for both crimes. But, the State argues that child molestation and incest have different statutory intents and the reasons the Supreme Court reached this same conclusion about rape and incest apply equally to child molestation and incest. The State relies on *Calle* to argue that legislature intended separate punishments for child molestation and incest. 125 Wn.2d at 780. In *Calle*, our Supreme Court considered double jeopardy concerns arising out of a single act of intercourse and held the double jeopardy clause did not prevent convictions for both rape in the second degree and incest in the first degree arising out of a single act of intercourse. *Id.* at 774-75. It further mentioned that "the differing purposes served by the incest and rape statutes, as well as their location in different chapters of the criminal code, are

evidence of the Legislature's intent to punish them as separate offenses." *Id*. at 780. Even though we understand the double jeopardy analysis and the same criminal conduct analysis are distinct, we still have to look at the statutory intent of the offenses, as did the court in *State v. Dunaway*,[12] *Chenoweth*, and *Westwood*. *See State v. Hatt*, 11 Wn. App. 2d 113, 139, 452 P.3d 577 (2019) (holding same criminal conduct differs from double jeopardy violation claim); *State v. French*, 157 Wn.2d 593, 611, 141 P.3d 54 (2006) ("A double jeopardy violation claim is distinct from a 'same criminal conduct' claim and requires a separate analysis."); *State v. Tili*, 139 Wn.2d 107, 119 n.5, 985 P.2d 365 (1999) (noting "same criminal conduct" analysis under Sentencing Reform Act of 1981,[13] and "unit of prosecution" analysis under double jeopardy are distinct).

Again, the statutory definition of child molestation in the second degree, RCW 9A.44.086(1), reads as follows:

> A person is guilty of child molestation in the second degree *when the person has . . . sexual contact with another* who is at least twelve years old but less than fourteen years old and the perpetrator is at least thirty-six months older than the victim.

(Emphasis added.) The statutory definition of incest, RCW 9A.64.020(1)(a), is the following:

> A person is guilty of incest in the second degree if [they] *engage*[] *in sexual contact with a person whom* [*they*] *know*[] *to be related to* [*them*], either legitimately or illegitimately, as an ancestor, descendant, brother, or sister of either the whole or the half blood.

(Emphasis added.) Here, Adams still fails to explain how the different intent, and other elements, of incest and child molestation support a conclusion of same

---

[12] *State v. Dunaway*, 109 Wn.2d 207, 217, 743 P.2d 1237 (1987).
[13] Ch. 9.94A RCW.

objective intent. The mere fact that both crimes require proof of sexual contact does not establish that they share the same statutory criminal intent. As our Supreme Court noted, with regard to the crimes at issue in *Calle*, the crimes of conviction in the present case, incest and child molestation, are also defined in two separate sections of the criminal code. 125 Wn.2d at 780. Incest is defined in chapter 9A.64 RCW, "Family offenses," and child molestation in the second degree is defined in chapter 9A.44 RCW, "Sex offenses." Furthermore, *Chenoweth* held that "the intent to have [sexual contact] with someone related to you differs from the intent to have [sexual contact] with a child." 185 Wn.2d at 223. The same is true for incest and child molestation. Therefore, we conclude that the crimes of conviction do not share the same criminal intent and the trial court did not err when it declined to treat them as the same criminal conduct for purposes of sentencing.

## VI. Legal Financial Obligations

Adams next asserts, and the State concedes, that the VPA should be stricken under the recently amended version of RCW 7.68.035 and based on the trial court's finding that Adams was indigent. We accept the State's concession and remand to strike the VPA from the judgment and sentence.

Affirmed in part, reversed in part, and remanded to strike the VPA.

WE CONCUR:

- 30 -